Jones v. Jackson.

JONES *et al. v.* JACKSON *et al.*

| 9 | 237 |
|---|---|
| 80 | 358 |

The pay-dirt and tailings of a miner, which are the productions of his labor, are his property.

When a place of deposit for tailings is necessary for the working of a mine, there can be no doubt of the miner's right to appropriate such ground as may be necessary for this purpose; provided he does not interfere with pre-existing rights. His intention to appropriate such ground must be clearly manifested by outward acts. Mere posting notices is not sufficient. He must claim the place of deposit as such or as a mining-claim.

To suffer the tailings to flow where they list, without obstructions to confine them within the proper limit, is conclusive evidence of abandonment, unless there is some peculiarity in the locality constituting an exception to this rule. If no artificial obstruction is required to confine them within the proper limits, then none is necessary.

If a miner allows his tailings to mingle with those of other miners, this would not give a stranger a right to the mixed mass.

Where tailings are allowed to flow upon the ground of another, he is entitled to them.

APPEAL from the District Court of the Fourteenth Judicial District, County of Sierra.

This was an action of trespass to recover damages for cutting and breaking dam of plaintiffs, erected below a tunnel mining-claim, for the purpose of collecting tailings wasted from said claim, and also for washing away tailings, destroying sluice-boxes, etc. Complainant prays for damages, and also for an injunction enjoining and restraining defendants from taking or interfering with the tailings flowing down the ravine from the tunnel mining-claim known as the Monte Cristo Claim.

Sometime in the summer of 1853, a company of miners, composed of several partners, located at or near Monte Cristo, in

Sierra County, a tunnel mining-claim. Two other companies, called the Swanton and Exchange Companies, located tunnel claims about the same period.

The Monte Cristo Company tunnelled into the mountain side over one thousand feet, and there reached a very rich lead of gold-bearing gravel and cement difficult and slow to dissolve. The company commenced washing pay-dirt from said tunnel in February, 1854, through a sluice about one hundred and fifty feet in length. The tailings from the sluice deposited them-selves on a flat below, about five hundred yards in length. In October, 1854 or 1855, the company built a sort of a dam or obstruction, some distance below the lower end of their sluice, to prevent the tailings from passing down the stream, and also put up on a tree near by, a notice stating that they claimed the tailings for re-washing. The Swanton and Exchange Companies also deposited their tailings on this flat. There was usually a log laid down to divide and designate the tailings of these dif-ferent companies; but it was often overrun and covered up, and thus the tailings of the different companies mingled together. This flat was the only place where the tailings could be deposited, as the banks were precipitous on either side, and it had been used for near two years for the deposit of all the tunnel compa-nies in that locality.

About the first or twelfth of October, 1855, the defendants' grantors located and took up on this flat twenty surface mining-claims, under the name of the Express Company, and including the ground upon which the tailings of the Monte Cristo Company were deposited. They posted their notices on a tree a short dis-tance above the head of the ground claimed by them, and soon after commenced working the ground. About three weeks after putting up the first notice, another was posted up near the middle of the claims. The testimony respecting the quantity of tailings on the flat and the existence of the dam of the Monte Cristo Company at the time of the location of the Express Company claims, is conflicting, but the weight of evidence is, that there were little or no tailings there, and no dam, but the dam was re-constructed in 1856. On the 22d of September, 1856, the plain-tiffs purchased of the Monte Cristo Company all the tailings of this company on the flat, and also all the tailings and waste water that flows down from said company's claim for one year therefrom. Subsequently, when plaintiffs commenced to wash the tailings, defendants interfered, drove plaintiffs off, and with an axe cut up and destroyed their sluices and tore down the dam, and ran the tailings into defendants' flume. On the trial, certain instructions were given to the jury, and some denied. All of which appear in the opinion of the Court.

*Henry Meredith* for Appellants.

The plaintiffs requested, and the Court refused, the following instructions, to wit:

"2. To entitle defendants to wash the tailings from the Monte Cristo Company's tunnel, after being sold to plaintiffs, defendants must show they had purchased such tailings, or that such tailings had been permitted to run upon ground after such ground had been lawfully appropriated by defendants."

"3. And that a party turning tailings down upon a flat or ravine, not claimed by such party, with the intention of abandonment, loses his right to the same; but the pre-emption of abandonment, arising from the fact of their being turned loose, may be rebutted by other circumstances showing an intention to continue the claim; and a party turning out their tailings upon unenclosed and unoccupied ground, does not lose his rights to the same unless he intends by so doing to abandon."

The refusal of the Court to give these instructions as requested, and the exception of the plaintiffs to each ruling, first arises for consideration on appeal.

The propositions contained in these instructions are simple, adopted to the anomalous interests and wants of the country, and observed by general consent in the mining community.

The pay-dirt and tailings of a mining-company, are the products of its industry, and as such entitled to the fullest protection.

Every encouragement, which could be considered by State legislation and federal acquiescence, has been afforded to the outlay of labor and capital in acquiring the precious metals embedded within the rocks and mountains within our confines.

The fruits and results of such enterprises have so readily received the recognition and fostering care of our Courts.

When the auriferous earth has been raised and removed from its native bed, and brought forth from the deep interior of a mountain to its place of washing, it becomes a chattel or personal property, and must be regarded as the creation and product of the miner's labor.

There being both a severance and asportation, the matter is no longer part of the freehold, but personalty.

So long as its chattel character is preserved, the owner can not lose his right by the mere act of depositing it or accumulating it upon the public grounds or claims of another, when there is no intention of abandonment.

I may turn my horse out upon the commons, or the land of another, with the intention of reclaiming him, and he continues my property, though by the act of turning him out I committed a trespass.

The pay-dirt of a mining-company, so long as kept distinguishable from other soil, is as completely personal, and attended by like incidents.

The Court below seemed impressed with the erroneous opinion, that the tailings or sluiced pay-dirt of a mining-company should be treated by the same rules, and were attended by the same legal incidents as water or alluvion, and that upon whatever soil they were deposited or allowed to accumulate, they immediately attached as an incident to the land.

The authorities show such a consequence is an incident to the proprietorship of the soil, recognized by the common law.

The maxim, *cujus est solum, ejus est usque ad cœlum*, is the foundation on which this incidental right depends. Angel on Water, 5, 6, 7, 8, 9; Ib., 53, 54, 55; Black. Com., 2 B, pp. 161–2.

When we remember the parties are not owners of the land but were occupants of the public domain, this rule does not seem to apply.

Appropriation, while the origin is the limit to such a one's rights, and nothing merely superincumbent, is acquired by simple occupancy of the soil.

The owners of a mining-ditch turned out the water from it, with the intention of using the same, into a dry ravine or torrent-bed which had before been appropriated by others, and those others as prior owners of the ravine claimed such water: Held, by the Court, that such waters did not become the water of the ravine unless turned in with the intention of abandonment. Hoffman v. Stone, 7 Cal., Jan. Term.

In that case, the appropriation was of the water of the ravine, and the ravine itself for carrying such waters.

In the case before the Court, the defendants located the ravine for constructing their flume and washing the gold of the ravine. Water more readily re-annexes itself with and becomes part of the earth it flows upon, than do the tailings and gravel of a tunnel-company, unlike in color and nature from the natural surface, and which is kept in a distinguishable heap.

The plaintiffs, as the evidence shows, ran their tailings and gravel from their sluice-boxes, and confined them upon a flat below for a second washing.

Nature furnished this single level spot in that locality, and the grantors of plaintiffs, with other tunnel-companies, economized, by availing themselves of it as a reservoir for catching and holding the pay-dirt for such re-washing. For such an act to destroy their property to the valuable products of their expensive labor, or to entitle others, having no ownership in the land, subsequently to avail themselves of such products without compensation, is repulsive to justice; and to prevent the same, the Court was asked to instruct the jury that the intention of abandonment must accompany the act.

The instruction given by the Court was highly prejudicial to the plaintiffs, and was by them excepted to.

The concluding portion of the instruction is as follows: "But

if the jury believe, from the testimony, that the tailings from the Monte Cristo Tunnel were allowed to flow from their sluices upon mining-ground lawfully located by the defendants, or those under whom they claimed, there to mingle with the tailings of other companies than the Monte Cristo, they would have no right to reclaim the same, and could convey none to plaintiffs, and the jury should find for defendants, unless they believe more injury was done to the dam and sluices, than was necessary to remove the obstructions caused by them."

To incorporate the doctrine that confusion of goods creates property, was attempted in this instruction, but in the attempt the error occurs : That if the goods of A are suffered to mix with those of B and C, such confusion gives a right to a fourth person, D, to take the whole.

The doctrine of confusion of goods operates only in favor of the one whose goods are, without his consent, interfered with by the mixture, and when both and all the proprietors consent, they have an interest in common. Black. Com., 2 B., p. 405.

In this case it has before been remarked, the lofty and precipitous mountain into which numerous tunnels had been run, afforded but one spot on its side which could be used as a reservoir for catching tailings and pay-dirt for washing.

Upon this spot, or flat, the different tunnel-companies, with common consent, deposited and accumulated for a second washing their tailings and pay-dirt, keeping them separate as well as they were able, by shoveling apart and dividing by logs, etc.

The instruction of the Court announces this proposition as law : That if the Monte Cristo Company (plaintiff's grantor) permitted tailings and pay-dirt to flow down and mingle with the tailings of the Swanton Company, and other companies, though by the consent of all, that thus the Monte Cristo Company lost all right to its portion, and could convey none to plaintiffs, and that defendants, Jackson and Hughes, owning no part thereof, acquired thereby a right to take the tailings of all the companies.

Under this instruction, the rights of plaintiffs were made in the minds of the jury to depend and cease upon the confusion of plaintiff's goods with the goods of others, strangers to the suit, who consented to such confusion so far as it extended, and the rights of defendants, who could neither object nor complain of such confusion to accrue upon such happening.

The injurious effects of such an instruction upon plaintiff's case are manifest. From the steady customs and practice of the mining community on this subject, as likewise from reflection, we deduce the following conclusions, believing they will be found by this Court consonant with law, and its own previous rulings.

The conclusions are these, viz. :

The pay-dirt and tailings from a mining-claim are personal property belonging to those who detach the same from the earth,

and the ownership of such property is not lost by its being suf-fered to accumulate upon ground claimed by another, or upon vacant public ground, unless done with the intention of aban-donment, or unless allowed to mingle with the tailings or pay-dirt of the owner of such mining-claims without his consent, and the possessor of a mining-claim in this State has not a freehold interest in the land, and while his rights are co-extensive only with his appropriation, the ownership of superincumbent pro-perty does not follow as an incident to his occupancy of the land for mining purposes.

*Francis J. Dunn* for Respondent.

The testimony is conflicting, but the weight of it is to this ef-fect :

That the mining-claims at Monte Cristo are all worked through tunnels, and the refuse or wash from several companies, com-monly called tailings, after passing from the sluice-boxes of said several companies, namely : the Monte Cristo, West Point, Ex-change, and Swanton Companies, find their way—being propelled by water—into a ravine, and there mix and mingle together, and so remained unappropriated and unused until the predecessors of the plaintiffs, called the Express Company, located the grounds and ravine on which said mixed and mingled tailings had depos-ited, for mining purposes, including the washing of the tailings. Defendants, who, by purchase, were the owners of the Express ground or mining-claims, commenced washing, and did wash the tailings that had deposited and were being deposited from the Monte Cristo and other mining-grounds, as aforesaid, when plain-tiffs built a dam, which stopped and set back said tailings, (and that within defendants' claims,) and prevented them from flow-ing as they were accustomed to, and had before that done; which dam, defendants deeming a nuisance to them, abated in a peace-able and quiet manner, and for which plaintiffs brought suit for damage, and obtained an injunction against defendants restrain-ing them from washing the tailings or interfering with the dam. The plaintiffs, it is true, endeavored to show that the Monte Cris-to Company had built a dam before defendants' location of claims to catch tailings, but on this there was conflict of testimony, and from the whole of it, when weighed, the jury concluded that they had built no such dam, and never, until the location of de-fendants' mining-claims, noticed or claimed the tailings from their claims, but had abandoned the same, and it was only after the labor of defendants proved the tailings to be valuable, that claim to the tailings was set up by the said Monte Cristo Com-pany or plaintiffs.

The jury found for defendants, and the Court entered a judg-ment accordingly, and overruled a motion for new trial made by plaintiffs, and dissolved the injunction theretofore awarded them.

Respondents make the following points, and recite authorities as follows, to sustain them:

1. That every point made by appellants is unsustained by law and the authority cited by them.

2. The two instructions asked by the plaintiffs, and refused by the Court, were not law, and the Court below committed no error in rejecting them. The first amounted to this: That defendants had no right to any tailings deposited on their mining-claims from the Monte Cristo or any other companies, unless by purchase after the time that defendants or predecessors located; and the second instruction was of the same purport, but more objectionable. Both, if given, would destroy all rules of abandonment, mingling, or estoppel *in pais*. Shady Creek Company *v*. Grizzly Ditch Company, Cal. Rep. Law Dict., Title, Abandonment.

3. The instructions given by the Court, and not at the request of either party, were certainly as unobjectionable as instructions could be. Respondents are content, without further comment, to refer to them.

4. The Court should not have granted the plaintiff a new trial, as the verdict was with the weight of evidence, but even had it been balanced, this Court will not disturb the verdict of the jury, or the discretion of the Court below, as to awarding new trials. Speck *v*. Hoyt, 3 Cal. R., 413; Doak *v*. Palmer, 2 Cal. R., 177; Taylor *v*. McKinley, 4 Cal. R., 104; Watson *v*. McClay, 4 Cal. R., 288; Bartlett *v*. Hogden, 3 Cal. R., 55; Wood *v*. Forbes, 5 Cal. R., 14; Cohn *v*. Gower, 5 Cal. R., 55; Buell *v*. Bear R. Co., 5 Cal. R., 6.

BURNETT, J., delivered the opinion of the Court—TERRY, C. J., concurring.

The Monte Cristo, Swanton, and Exchange Companies located separate claims for tunnel-mining, at or near the head of a very steep ravine, in 1853. The different tunnels of these different companies penetrated under the mountain, to the distance of several hundred feet, where they found rich deposits of gold, in a hard formation, like cement, which did not dissolve readily in water, until after exposure to the atmosphere for a considerable space of time. From the character of this formation, it resulted that the first washings only extracted a portion of the gold, leaving the other portion to flow off with the tailings, which were deposited on a flat, several hundred feet below the mouths of the tunnels. The owners of the Monte Cristo tunnel posted a notice, in 1854, stating that they claimed the tailings running from their sluices, and that they intended to wash the tailings again. The tailings from the different tunnels were partially mingled, though some effort was made to keep them distinct. The mass of tailings could readily be distinguished from the soil

of the flat on which they were deposited, by the difference in color and appearance; and the flat was the first point where, from the natural features of that locality, the tailings could find a resting-place. In the summer of 1855, the parties under whom the defendants claim, located some twenty claims, called the Express Company's claims, on this flat, including a portion of the ground upon which the tailings were deposited. The Monte Cristo Company sold their tailings to plaintiffs, who went upon the flat, and erected their sluices, which were abated by the defendants, under a claim of right. This suit was brought to recover damages for the injury. The defendants had judgment in the Court below, and the plaintiffs appealed.

The Court, at the request of the plaintiffs, instructed the jury that "if they believed that the Monte Cristo Company were the first to appropriate the ground covered by the tailings, and, while continuing to hold and claim the same, said company conveyed the tailings caught or stopped on said ground to plaintiffs," and that afterwards the defendants did the injury complained of, then the plaintiffs were entitled to a verdict.

After giving the first instruction, the Court refused to give the second, as follows : "To entitle defendants to work the tailings from the Monte Cristo Company, after being sold to plaintiffs, the defendants must show that they had purchased said tailings, or that said tailings had been permitted to run upon ground after such ground had been lawfully appropriated by defendants."

This instruction was properly refused, as it was too broad in its terms. By it, the defendants were not permitted to wash the tailings deposited upon the claims, *before* they took them up, even conceding the intention of the Monte Cristo Company to abandon them.

The pay-dirt, as it is called, and the tailings, were certainly the production of the labor of the company, to which they were justly entitled, under proper circumstances. When a place of deposit for tailings is necessary, for the fair working of a mine, there can be no doubt of the miner's right to appropriate such ground as may be reasonably necessary for *this* purpose ; provided, he does not interfere with pre-existing rights. His intention, however, should be clearly manifested by outward acts. Merely posting a notice would not seem to be sufficient. To suffer the tailings to flow where they list, without obstructions to confine them within the proper limits, is conclusive evidence of abandonment, unless there is some peculiarity in the locality, constituting an exception to the rule. It may happen, in some localities, that no artificial obstruction would be required to confine the tailings within the proper limits. In such case, it would not be necessary to do an idle thing. But in this instance, the flat was some five hundred yards-long.

The Court further instructed the jury, in substance, that if the Monte Cristo Company constructed a dam upon *vacant* ground, for the purpose of catching the tailings, and then sold them to plaintiffs, and the defendants *afterwards* did the injury alleged, the plaintiffs were entitled to a verdict. But, if the tailings were allowed to flow upon mining-ground, lawfully located by defendants, or their predecessors, there to mingle with the tailings from other companies, then the plaintiffs could not recover.

It would not seem to be true, that the mingling of the tailings from different claims would give a stranger any right to the mixed mass. It may be a circumstance to prove the *intention* of those who permitted them to be thus mingled, so as to show an abandonment. But this is the extent to which such a fact can go. If A can have a right to a place of deposit, B may have, also; and if they can have such right separately, they can mix their property, if they please so to do. If parties voluntarily mix their property, this does not give a mere stranger any right to the mixture. The parties hold in common. (2 B. Com. 405.)

But this feature in the instruction could do the plaintiffs no injury. If we strike out this portion of the instruction, then the objection would be removed, and still the plaintiffs left in the same position. By the instruction, the Court required the jury to find *two* grounds to be true, in order to justify the defendants, the last of which was immaterial; but it could only injure the defendants, and not the plaintiffs. Whether the tailings were mingled or not, the defendants were entitled to a verdict, if the tailings were flown upon their own claims.

The third instruction offered by the plaintiffs was, also, properly refused. The substance of the instruction was, that a party turning tailings down upon a flat not claimed by him, is presumed to abandon them; but this presumption may be rebutted by other circumstances, showing an intention to continue the claim; and the act of the parties, in turning their tailings upon unoccupied ground, does not forfeit their right, unless they intend, by so doing, to abandon.

The place of deposit must be *claimed* as such, or as a mining-claim; and the intention of the claimant must be manifested by outward acts. The rights of others being concerned, the intention not to abandon is not sufficient *alone* to sustain the right. Although the intention not to abandon the right may in fact exist, and may be susceptible of clear proof, still the party may fail for want of a clear manifestation of that intent. The instruction placed too much stress upon the intention of the party. The instructions given by the Court were better applicable to the facts of the particular case. As an abstract proposition of law, the third instruction was not so far wrong; but its terms

were too broad for the circumstances of the case, and might have misled the jury.

There was some contrariety in the testimony. The instructions fairly submitted the question to the jury, and their verdict seems to have been warranted by the testimony.

Judgment affirmed.