ESMERALDA WATER COMPANY, A CORPORATION, APPELLANT, v. MARTIN MACKLEY, CHAS. R. HAMMOCK, ET AL., RESPONDENTS.

No. 3569

July 25, 1949.

208 P.2d 821

*Cooke & Cooke* and *Oliver C. Custer,* all of Reno, for Appellant.

*Carville & Carville,* of Reno, for Respondents.

## OPINION

By the Court, BADT, J.:

This appeal presents for our chief consideration the question of the ownership of tailings deposited by a mining and milling company, from its own and custom ores, or from custom ores alone, upon open and unappropriated public domain and there impounded in a tailings pond by a dam or retaining wall, as against a subsequent placer locator of ground including the tailings pond. Lest this seem over simple in view of the well-recognized rule sustaining the title to and possession of such tailings (unless abandoned) as against a subsequent location, we must add that the trial court limited this protection to the operator of the mill, *"Who also supplied the ore from the mine owned by him,"* in the absence of allegation and proof of a "custom" in the district that title to the tailings should vest in the mill. The trial court's application of this limitation resulted in a judgment for the subsequent locators, the defendants below, which we are called upon to review. Other questions of importance are presented, but they are all incidental to such main question.

Appellant Esmeralda Water Company filed its complaint in the court below, alleging that about 1870 its predecessors in interest engaged in the mining and

extraction of ores from certain lode mining claims owned and possessed by them, and milled and reduced the same in a quartz reduction mill owned by them situate adjacent to its mining claims; that the tailings from said operations, at the price and under conditions then existing, were not of sufficient value to warrant further treatment, but to keep and conserve them for future treatment under more favorable conditions the tailings were deposited upon open and unoccupied mineral land of the United States in a tailings pond in Columbus mining district in what was then Esmeralda county; that its predecessors built a stone wall or embankment around the same and that at the close of its mining and milling operations the pond contained about 7,000 tons of said tailings; that the plaintiff and its predecessors had thereafter maintained continuous peaceful possession of the tailings pond, repairing the stone wall from time to time to keep the tailings from being washed down the canyon and lost, and that for many years prior to 1947 plaintiff and its predecessors continually kept a watchman on the mine, mill and tailings premises to guard and conserve the same, and paid all taxes levied and assessed thereon; that about 1929 plaintiff acquired title and ownership of the said tailings and of the Dorris and Lake placer claims located by its predecessors in 1896, which placer claims embraced the tailings pond; that the land is valuable only for the tailings, alleged to be of a gross value of about $15 a ton and of a net value of from $2.50 to $3; that on January 23, 1947 the defendants wrongfully entered upon the tailings reservoir, locating certain placer claims named the Victory and the Victory Fraction over the same for the sole purpose of appropriating the tailings, and removed and marketed about 1,000 tons and threatened to remove the remainder. Plaintiff prayed for an injunction and that its title be quieted to the tailings and reservoir premises, for the value of the tailings removed and for costs and further relief.

The defendants answered and denied the material allegations of the complaint and alleged that if plaintiff had any title to the ground it had forfeited the same for failure to perform assessment work or to file notice of its desire to hold its claims under the acts of congress relieving the owner from such assessment work. Defendants then alleged their location of the ground as the Victory and Victory Fraction placers, and prayed that plaintiff take nothing, that the temporary restraining order theretofore issued be set aside, and for costs and further relief.

Plaintiff replied and denied the forfeiture, denied the relocations asserted by defendants, and as new matter alleged that for a period of seventy-five years prior to 1946 "the custom existed with ore reduction mills, operating in the State of Nevada and more particularly in what is now Mineral county, and including the adjoining round-about area, of the custom mill crushing or otherwise reducing ores delivered to it by divers persons, deducting its charges, and the tailings and slimes being carried out by the custom mill operator, and the ownership thereof vested in such custom mill operator;" and that the title to the tailings became vested in plaintiff's predecessors and later in plaintiff. The trial court sustained a demurrer to such new matter saying: "The two basic facts which must appear in such a pleading are the existence of a custom and the facts which would entitle the pleader to claim under such a custom so as to vest in that person certain property or other rights. These, I think, have not been alleged and I hold, therefore, that the reply is not good as against the demurrer filed by the defendants." The learned trial judge further explained that the reply received no aid from the complaint because the theory of the complaint was that plaintiff's predecessors treated in the mill the ores produced from their own mines, resulting in the tailings in question, while the reply was concerned "with the idea of ores being delivered to plaintiff's predecessor in interest as a custom mill."

Appellant claims that the record is devoid of any testimony to the effect that the tailings resulted from any ores mined by third persons and reduced by the mill as custom ores. Respondents, on the other hand, claim that advertisements in local papers published at the time and admitted in evidence in the case show clearly that the mill owner at the time was operating a custom mill and advertising for ores to be treated. The sustaining of the demurrer to the reply is one of the errors assigned by the appellant.

Respondents insist that the tailings lost their character of personalty and become part of the real estate occupied by the tailings pond; that the public domain upon which the tailings pond was situate was subject to placer location after appellant had forfeited the ground by failing to perform its assessment work or to file notices of desire to hold; that the relocations of the defendants were lawfully made and entitled them to the tailings, as well as the ground embraced within the exterior boundaries of their relocations; that in any event plaintiff had failed to prove that the tailings were deposited as a result of the treatment of ores mined and owned by plaintiff's predecessors; that such tailings were the property of the original person who mined the ore; that they were milled by plaintiff's predecessors (although the deraignment of title to plaintiff is denied) as custom ores; that in the absence of proper pleading and proof of a custom that title to tailings from custom ores vested in the mill, such title remained in the original mine owners.

The trial court found (1) the plaintiff's corporate status since 1929; (2) that commencing about 1870 sundry persons were engaged in mining in the district; "that a custom milling process was located upon the above-described premises, and custom ores from several mining properties were milled in said custom mill and the tailings therefrom were *by the mine operators* permitted to flow from said mill into a gulch which is situated on the north side of the mining camp known as

Candelaria in said Columbus Mining District, and which gulch is embraced within the above-described legal subdivisions; that in said gulch at a point some 1,500 to 1,000 feet below said milling operations above referred to, there was constructed a rock wall of some 8 or 10 feet in depth at the deepest point which followed the contour of the ground across said gulch; that this rock wall was constructed some time prior to the year 1896, apparently for the purpose of retaining the tailings from said mill. Evidence does not disclose by whom said rock wall was constructed. Overflow and driftings from said tailings, due to wind and storm, was checked by a smaller rock wall from 70 to 100 feet below the main rock wall, which also followed the contour of said land at this last mentioned point; that said lower rock wall had been constructed some time prior to the year 1896.

"That during the years between 1870 and the early years of 1880 the town of Candelaria came into existence and was occupied in connection with an active mining camp which embraced several large and a few small mining operations in this area. A spur railroad line extended from the nearest main line railroad into Candelaria which spur railroad had a schedule of regular runs; that a water line extended for a distance of some 27 miles, heading in the White Mountains area and furnished water for the mining and milling operations in said Candelaria mining district, as well as for the town of Candelaria; that by the year 1900, and not later than the year 1903, the said mining camp had become inactive; that at this time the mill was not operating, nor was there any evidence that the mines were operating in said mining camp, and the mining camp to a great extent had been closed down."

(3) That J. A. Corkill located the Dorris placer, and Fred Corkill located the Lake placer in 1896 and that "no connection was shown to exist between any of the producers of said tailings and the above named locators" (by "producers of said tailings" the court was referring to the miners and not to the mill) ; that proofs of labor

were filed on the Dorris and Lake placers each year from 1901 to 1908 "by various claimants of said mining claims; that for 1910 proof of labor was filed by Esmeralda Water and Milling Company, which same company filed a notice of desire to hold the same in 1917; that one Jarmouth filed such notice in 1918 for the Candelaria Mines Company; that from 1922 to 1926, inclusive, similar proofs were filed on behalf of Esmeralda Water and Milling Company and the Candelaria Mines Co.; (4) that the Corkills in 1899 conveyed the Lake and Dorris to one Sutherland, who in 1900 conveyed to one Bonbright, who in 1907 conveyed to Esmeralda Water and Milling Company, which company, through its trustees in 1929, conveyed to plaintiff; that no assessment work was performed or proofs of labor or notices of intention to hold filed after 1926, by reason whereof they became subject to relocation; (5) that Mackley and Hammock validly relocated the ground in 1946 and 1947 as the Victory and Victory Fraction placers; (6) that the plaintiff had forfeited its rights to the Dorris and Lake long prior to the time that the Victory and Victory Fraction were located, and that the latter relocations "were and are valid and subsisting relocations of portions of the Dorris and Lake placer mining claims forfeited by the plaintiff herein"; (7) "that plaintiff failed to substantiate by proof the allegations of its complaint and defendants have shown by proof the relocation of valid and subsisting mining claims known as the Victory Placer Mining Claim and the Victory Fraction Placer Mining Claim."

Appellant insists that the evidence is insufficent to show a forfeiture. We feel it unnecessary to review the testimony on this point. It is quite lengthy and contains many controverted facts. There was, however, ample testimony to justify the court's conclusion that the land upon which the tailings pond was situate had become forfeited by appellant, was subject to re-entry and was properly relocated by defendants.

It will be noted from the findings quoted above that

this is the only issue upon which the court made findings, except for the single finding that plaintiff had failed to prove the allegations of its complaint. Such blanket finding is of little assistance.

As hereinafter indicated plaintiff undoubtedly stated a cause of action for the recovery of the tailings irrespective of the ownership of the ground.[1]

The only conclusion of law drawn by the court from the foregoing findings was "that the defendants must prevail in this action, and it is ordered that the plaintiff take nothing by reason of its claim." The court made no findings on the question of the ownership of the tailings, or whether the title thereto, if vested in plaintiff and its predecessors, had been retained, disposed of or abandoned. It did not *find* that there had been any abandonment, nor did it *conclude* that there had been an abandonment. In ruling on objections to the proposed findings, it struck out the statement that the tailings had been abandoned. The reasons for this appear in the twenty-page "Decision on the Merits" filed by the learned district judge. After recognizing the rule of Ritter v. Lynch, C.C., 123 F. 930, and Goldfield Consolidated Milling & Transportation Co. v. Old Sandstorm Annex Gold Mining Co., 38 Nev. 426, 150 P. 313, that title to tailings is not lost by their deposit upon open and unoccupied public domain if the owner manifests an intention to retain title and control of the tailings, the learned district judge restricts this principle to a case in which a miner extracts ores from his own mines and treats such ores in his own mill, and holds that the proper application of the principle of such ownership of tailings "requires a showing in this instance at least, of production of the tailings from the operation of the

---

[1] "§ 9026, N.C.L. An action may be brought by one or more persons against any other person or persons for the purpose of determining an adverse claim which the latter makes against the former, for money or property, upon an alleged obligation or liability of any nature or kind, or upon any claim for an accounting, or for any other legal equitable relief."

mill owned by the mine owner, who also supplied the ore from the mine owned by him." After finding that there was no proof of custom in the district which would make the mill the owner of the tailings, the learned district judge repeated: "The plaintiff must in some manner connect itself with the producer of these tailings in order to succeed on the theory that these tailings are personal property which has not been abandoned."[2] As we have seen, the court did not pass on any issue of abandonment. Respondents likewise insist that, "The question of abandonment does not enter into this case." This is later emphatically repeated, and it is again stated by respondents: "The lower court eliminated the theory of abandonment on the evidence taken as a whole and rendered its decision upon the theory of forfeiture for failure to protect the Dorris and Lake claims through proper assessment work." We agree that this is a proper analysis of the lower court's theory in its written opinion, its findings, its conclusion, its judgment, and its order denying the motion for a new trial. With this theory, however, we are unable to agree.[3]

In Ritter v. Lynch, C.C., 123 F. 930, 932, plaintiff laid claim to certain tailings on the basis of his location of

[2]The learned district judge further stated: "For a case on this point see Stanley v. Sierra Nevada Silver Mining Company, [C.C.], 118 F. 931." The reference is apparently in error. That action was one for the conversion of a deposit of tailings of the value of $5,000, and the opinion referred to held the complaint good as against a demurrer which attacked the sufficiency of the allegation of ownership of the tailings. Judge Hawley, citing a number of cases, held that the allegation that plaintiff was *lawfully possessed* of the property was sufficient. Citing Rogers v. Cooney, 7 Nev. 213, as a similar case, the federal court quoted the holding of this court that it was only necessary "for the plaintiff to prove a rightful possession in himself. It is not incumbent on him to establish any title beyond that." The authority is not even remotely in point on the proposition of law stated, and it is the only authority cited in support of such point.

[3]Respondents say further: "Abandonment plays no part in this case except insofar as the action of the miners who delivered the ore to the mill did not claim the tailings therefrom after they were discharged through the mill."

the land on which the tailings had been impounded. The defendants claimed that the tailings were their personal property at the time of plaintiff's attempted location. Judge Hawley said: "Did the defendants, or those under whom they claim, prior to and at the time of the location of the ground by plaintiff as a placer mining claim, have any valid right of ownership and possession, or right of possession, to the tailings situate on the land in controversy, and, if they acquired any such right, has it been maintained, and was it valid at the time the plaintiff attempted to acquire the title to the ground, and at the time he was ousted therefrom? The defendants were not seised in fee of the title to the land. Their ownership and right to the tailings and possession of the land covered by the reservoir in which the tailings were impounded is not necessarily dependent upon their having the legal title to the land. It rests upon other grounds. It appears from the testimony on behalf of defendants that Michael Lynch, prior to 1868, obtained the title to about six acres of land known as the 'Hoosier State Millsite,' situate above the land in controversy in this action; that he was the owner of a mill upon said land, and operated the same for the crushing and reduction of ore from the Comstock lode; that in the natural working of said mill the tailings therefrom, unless restrained, would run down the canyon, and become lost to the owner thereof; that, in order to impound the same, he constructed a reservoir or bulkhead, situate in the canyon or ravine a short distance below the mill on the ground in controversy, of such size and dimensions and in such manner as to confine the tailings conducted by him from said mill, and enable him to keep and preserve the same from waste or destruction until such time as they could profitably be worked or sold. The reservoir was principally built of the tailings, banking them up in a wet state at the lower end so as to become solid enough to keep the tailings running down the ravine in the reservoir. This reservoir was built upon vacant, unoccupied public land of the United States."

The learned district judge for the District of Nevada then quoted with approval Jones v. Jackson, 9 Cal. 237, to the effect that when a place of deposit for tailings is necessary for the fair working of a mine, there can be no doubt of the miner's right to appropriate such ground as may be reasonably necessary for this purpose, provided he does not interfere with pre-existing rights. It is true that in Jones v. Jackson reference is made to the deposit of the tailings by "the miner," but the Ritter case is patently not so restricted, as it is stated definitely that the Lynch mill was operated "for the crushing and reduction of ore from the Comstock lode." If there is any indication in the case one way or the other, it is that the ores of various mines on the Comstock lode were treated in the Lynch mill. It is interesting to note that in the Ritter case, as in the present case, two distinct issues were raised, one growing out of the possessory right to the ground, the other growing out of the ownership of the tailings. In the Ritter case, however, the court (inversing the order of the instant operation) disposed of the issue of the possessory right to the ground and decided the case upon the issue of the ownership of the tailings, holding that such ownership persisted unless there had been an abandonment. The court then reviews the factual situation at length, which is astonishingly similar to the state of facts in the present case—the deposit of the tailings on public domain; the construction of a bulkhead; the solidifying of the tailings, which maintained them fairly intact even without the bulkhead; the employment of an agent to look after the property "including the ground in controversy"; the testimony of the agent as to activities to prevent the tailings from being washed away; the doing of some work on the reservoir; the granting of permission to other parties to sample the tailings with a view to lease or purchase; the occurrence of a high freshet which washed away a portion of the tailings; the location of the tailings pond below the mill site, etc. There was a total absence of any reference to a custom as to the

ownership of the tailings. The placer location over the tailings pond was ostensibly to obtain the tailings, although, the ground itself may have been otherwise somewhat mineralized. The court then devotes itself to the question of abandonment and, in holding there was no abandonment, says: "Abandonment is a question of intent, to be determined by the special facts in any given case. In order to constitute abandonment of the right of possession which the defendants had acquired, there would have to be shown a clear and unequivocal act or acts of the parties, showing a determination on their part to surrender their right to the property. There must be the concurrence of the intention to abandon and the actual relinquishment of the property, and of their right, dominion, and control over it. The record clearly shows—independent of the testimony of Mrs. Lynch that she had never in any manner, shape, or form intended to abandon or release her claim to the tailings—that the property was never abandoned by the defendants. The facts disclosed by the record are, in my opinion, sufficient to show that the defendants have preserved their ownership of the tailings and possession of the land upon which they were impounded, and that plaintiff did not, by his acts, acquire any right or title thereto as against the defendants."

In Goldfield Consolidated Milling & Transportation Co. v. Old Sandstorm Annex Gold Mining Co., 38 Nev. 426, 150 P. 313, 315, we are left with no uncertainty as to the fact that the tailings resulted from ores milled by a custom mill. Said this court, through COLEMAN, J.: "The respondent alleges in its complaint that it is organized for the purpose of milling, and reducing by other methods, gold, silver and other ores, and that it now is, and for a long time past has been, engaged in the carrying on of the said business of milling and reducing ores; * * * that in the operation of the said mill there are discharged therefrom large quantities of pulverized rock and earth, commonly known as 'tailings,' * * *

valuable and are being conserved by respondent for re-treatment." The tailings were deposited within retaining dams on the respondent's own property, but had overflowed the same and respondent sought to condemn a portion of appellant's property for the storage of tailings. Among other defenses, the appellant alleged that respondent had abandoned the tailings and that the same had become the property of appellant. This court said: "* * * the lower court found it necessary to determine also the question of the ownership of the tailings deposited thereon. It appears from the evidence that respondent, after treating the ores *which it had purchased*, deposited the tailings upon a portion of its own land which lies in a gulch, through which water flows at times in great volume and with great force. It also appears from the evidence that it was necessary for respondent to keep a man employed at all times to dam up the tailings so that they would not wash away and be lost, and as a consequence of this damming process the tailings eventually were forced upon the land of appellants. It also appears that these tailings are valuable and can be re-treated profitably. Respondent seeks to re-treat these tailings, and to do so finds it necessary to erect a tram to convey them to its mill. Appellants claim that they are now the owners of the tailings. *Having purchased the ores from which the tailings came*, respondent was the owner of them at the time they were deposited upon the lands of appellants." (Italics supplied.)

The court then quotes at some length from Mallett v. Uncle Sam Gold & Silver Min. Co., 1 Nev. 188, 90 Am. Dec. 484, to show that there has been no abandonment— "the intention is the first and paramount object of inquiry; for there can be no strict abandonment of property without the intention to do so." See cases therein cited, including Ritter v. Lynch, supra. Deciding then that the lower court had properly held that

there was no abandonment,[4] the court in introducing its discussion of the question of the right to condemn the land in question, says: "Being, then, the owner of the tailings, * * *." There was no proof of custom as to ownership of the tailings. They were the property of the custom mill, although they were the direct result of the treatment of ores supplied to the mill by the mine operators. The milling company was apparently not even authorized by its charter to engage in mining. See, also, Rhodes Min. Co. v. Belleville Placer Min. Co., 32 Nev. 230, 106 P. 561, 118 P. 813, in which, as in the present case, conflicting claims were asserted to certain tailings, and the titles asserted grew both out of ownership or possessory right to the land and out of ownership of the tailings as personal property. Ritter v. Lynch is there characterized by this court as upholding the title to tailings in the owner, who had retained them in a reservoir against the locator of the placer claim. The "owner," as we have seen, was the owner of the mill.

In Guild Gold Min. Co. v. Mason, 115 Cal. 95, 46 P. 901, the plaintiff mine owner sued the chlorination works on an alleged contract to reduce plaintiff's ore for $17 a ton and to return to plaintiff at least 90 percent. Plaintiff maintained that less than 90 percent was recovered and estimated that there was still $350 in the tailings. After holding that the plaintiff could possibly recover if a large amount had been lost in the tailings by reason of fraud, lack of skill, carelessness or neglect (which was not pleaded by the plaintiff) the court said: "Nor is there any allegation or evidence of any custom or agreement

---

[4]In holding that the district court properly found that there was no abandonment this court said: "It conserved the tailings by having a man on hand to keep a dam built up so as to prevent their being washed away, which it is not likely it would have done had it intended abandoning them. The testimony was to the effect that respondent did not intend to abandon the tailings." The testimony against the theory of abandonment is stronger in the instant case than in the Goldfield Consolidated case. In re Waters of Manse Spring, 60 Nev. 280, 108 P.2d 311.

that the tailings should belong to or be delivered to the plaintiff." The intimation to the contrary would seem to be clear, namely, that without such allegation or evidence the tailings would be the property of the reduction plant. In O'Keiffe v. Cunningham, 9 Cal. 589, it was recognized that open ground used as a place of deposit for tailings by another was subject to location, but that such subsequent location would be subject to the prior right of deposit.

In 1939 most of the important questions raised in the present appeal and discussed in the foregoing authorities were brought before the supreme court of Montana in Conway v. Fabian, 108 Mont. 287, 89 P.2d 1022, 1024. Conway and another sued Fabian and others "to try title to mill tailings deposited on placer mining ground claimed by defendants, recover damages for entry on, removal of, and waste of, such tailings, and enjoin trespasses on plaintiff's property by defendants, who filed a cross-complaint to quiet title to placer mining claims on which the tailings were situated." It will be noted that in general this was the issue presented by the plaintiff's complaint here. Conway and his predecessors were the owners both of the mining properties and of the mill that concentrated the ores, for which reason respondents insist that the case is not in point. It is, however, not so lightly disposed of. As in the present case, the tailings contained mineral values, which fact was known to the owners, but the metallurgical processes and primitive milling machinery of the time (1881 to 1898) did not permit recovery of such values, and the tailings were impounded for possible future working, bulkheads being constructed and maintained for the purpose. The trial court found that since the depositing and impounding of the tailings, plaintiffs and their predecessors had been in actual open, continuous and exclusive possession, *and that they had not at any time abandoned the same*. As in the present case, some had been washed away by rain and storm but were otherwise intact. The claim of the

defendants to the tailings was predicated upon their location of certain placer claims embracing the tailings dump. These placers had been regularly located and the annual representation work kept up. The supreme court of Montana approved the finding of the trial court that, although the placers of the defendants were their property, the defendants were nonetheless "not the owners nor in possession of the tailings * * * impounded on the claims * * *, the plaintiffs and their predecessors in interest having retained possession and ownership thereof at all times as personal property." Recognizing the fact that some of the tailings, not included in the tailings pond proper, had spread over the ground or had become imbedded in the soil, such part of the tailings was held to have become a part of the real estate included within the defendants' placer claims, citing Rogers v. Cooney, 7 Nev. 213. The Montana court stated: "The most important question in this suit is undoubtedly the property classification to be given to the tailings * * *," and holds definitely that tailings placed on the ground from milling operations by their owner prior to a placer location and which have not been abandoned are not within the rule or principle of Rogers v. Cooney; but that the owner of a subsequent location takes subject to the right of this prior deposit. Throughout the opinion it is emphasized that the ownership or right of possession of the tailings maintains unless abandoned. The building of the barriers, the subsequent repair thereof, the exhibiting of the dump to prospective purchasers or lessees, the taking of samples, are all cited as evidence that the dump was personal property and that it had not been abandoned. The Montana court cites as authority O'Keiffe v. Cunningham, 9 Cal. 589; Jones v. Jackson, 9 Cal. 237; Ritter v. Lynch, C.C., 123 F. 930; and Goldfield Consolidated Milling & Transportation Co. v. Old Sandstorm Gold Mining Co., 38 Nev. 426, 150 P. 313, all of which we have discussed, supra.

■ If Ritter v. Lynch and Goldfield Consolidated Milling & Transp. Co. v. Old Sandstorm Gold Mining Co. are not enough to establish the conclusion that in this state at least the tailings from the treatment of ore become the property of the custom mill (in the absence of contract or other showing to the contrary), other things strengthen this conclusion. The construction and maintenance of the impounding dam, negotiations for sale or lease, the sampling and other acts appearing in the record, some of which are referred to herein, all were, as we have indicated, sufficient to show possession in appellant. They undoubtedly show the exercising of acts of ownership. Such possession and acts of ownership are by our statute presumptive evidence of title. Among the disputable presumptions provided by our statute are: "That things which a person possesses are owned by him; that a person is the owner of property from exercising acts of ownership over it, or from common reputation of his ownership." Stats. of Nevada 1931, p. 61, sec. 558g, subds. 11 and 12, N.C.L.1931–1941 Supp., sec. 9047.07, subds. 11, 12. In effect since its enactment in 1877 has been the following provision in this state:

"Preferred Lien on Ore.

"Sec. 1. Where ore is delivered to a custom mill or reduction works, and either sold to said mill or reduction works, or worked at a percentage, the party or parties so furnishing ore to mill or reduction works shall have a preferred lien upon the bullion product and upon the ore not reduced, as against attachment and other creditors." Stats.1877, p. 90.

The preservation of such a lien in the miner furnishing the ore to the mill is inconsistent with any theory other than that the title passes to the mill. If still further evidence is needed on this point, it is supplied by the record itself.

The learned district judge's written opinion referred to the ownership of the water as well as the ownership

of the mill by Candelaria Water Works & Milling Company, Ltd., which in 1886 and in 1891 advertised in local papers, seeking business in the reduction of ores. There were introduced in evidence contracts entered into in those years by such Candelaria Company with the Georgene Mining Company of New York and with the Holmes Mining Company of San Francisco.[5] In these contracts we find that the mining companies agreed to *"deliver"* at the mill daily certain specified tonnages of ore; that none of their ore would be *"sold or disposed of* to any *other* person."* The mill agreed to reduce the ore on a sliding scale of charges depending upon the assay value of the ore. The mining companies agreed that none of the ore should "be *reduced or otherwise treated elsewhere."* The agreement provided for arbitration "on any question or difference as to the construction or meaning" of any terms of the agreements or the rights, duties or liabilities of the parties thereunder. The apparent interchangeable use of words in these contracts whereunder the miners "delivered" their ore to the mill and agreed that no ores should be "sold or disposed of" to any other person and should not be "reduced or otherwise treated elsewhere," with no reservation of any interest in the tailings, with no claim ever made by these or any other mining companies to any part of the tailings, with no application for arbitration of any claim to ownership of any part of the tailings, with the long lapse of time without any such claim, with the impounding and continuous possession of the tailings by the mill, the ownership of such tailings by the mill would seem well and substantially indicated. This is strengthened by the advertisements themselves published in 1886 and 1891, introduced by the defendants, entitled

[5] The Georgene and Holmes properties were later operated under the management of Argenta Mining Co., or combined to own the Argenta. From prior to 1922 to 1946, a watchman and caretaker looked after these properties as well as the waterworks, tailings pond, etc., of Esmeralda Water and Milling Co., and later, Esmeralda Water Co.

"Custom Ores" and advertising that the mill would *"pay for* silver ores" under a specified sliding scale and that the silver would be *"settled for"* at New York quotations. Further the defendants themselves also introduced their report of "net proceeds of mines" under which they were required to pay taxes on the proceeds of the tailings they had shipped. This report, submitted on a printed form supplied by the Nevada Tax Commission showed, among other things, that the tailings were *"sold"* to the American Smelting & Refining Company. This recalls, to all who have had occasion to look, pictures of the vast slag and tailings dumps, embracing hundreds of thousands of tons, resulting from the treatment by the large smelting and refining companies of ores from mines scattered throughout the west.

This apparently universal custom, considered in connection with the physical and realistic aspect of transactions between the miner and the mill, may account for the total lack of any adjudicated cases dealing with the ownership of tailings in any controversy that raised the question as to whether the producer or the mill owned the tailings. In all cases, as in the present case, the tailings resulting from the reduction by the custom mill of the ores of the various producers are hopelessly confused. Segregation of the tailings for return to the various producers would be virtually impossible. Instead of a sale to the mill, each transaction would involve a most complicated bailment. The confusion and commingling of the tailings would be both in lateral layers or strata and also in distribution over the area of the tailings pond. Nor would the statement of one of defendants' witnesses that different colors of the tailings indicated the reduction of ores from different mines be of much assistance in segregating portions of the intermingled mass.

As a matter of fact during the period from 1940 to 1942 plaintiff leased the tailings pond to people who were interested in extracting only the quicksilver. This

quicksilver was not the product of any ores supplied to the mill for treatment, was apparently not mined at all in the district, but was purchased, furnished and used by the mill itself in the process of recovering values from the ores that it treated.

Respondents contend, and it was apparently the holding of the trial court, that because the Corkill locations of the Dorris and Lake placers were not contested and the Corkills and their successors in interest (eventually the plaintiff herein) filed proofs of labor thereon for many years, this is in some way a recognition by plaintiff and its predecessors that the tailings, embraced within the exterior boundaries of these two placers, were part of the realty and belonged to the owner of the placer location. This is not necessarily so. The Corkills did not attempt, so far as anything in the record shows, to remove any of the tailings. The owner of the tailings could well have been justified in concluding that these placer locations were made subject to its rights to remove its tailings. Conway v. Fabian, 108 Mont. 287, 89 P.2d 1022; O'Keiffe v. Cunningham, 9 Cal. 589. The mill company might, as suggested by Judge Hawley in Ritter v. Lynch, C.C., 123 F. 930, have desired to pursue the safer course in actually acquiring the possessory right to the placers and for such reason have purchased or otherwise acquired the Corkill locations.[6]

It is important to note the following paragraph of the

[6] The Corkills' possessory rights growing out of their location of the Dorris and Lake claims in 1896 lasted only till they conveyed to Sutherland in 1899, who, the following year, conveyed to Bonbright. (Sutherland was the treasurer and general manager of Georgene Mining Company, all of whose ores were processed at the mill under the contract of 1886, and was president of the Holmes Mining Company, all of whose ores were processed through the mill under the contract of 1891. The mill on those dates operated as the Candelaria Water Works and Milling Company, Ltd., whose registered office was at Drapers Garden, Throgmorton Street, London.) Although the Georgene Mining Company, the Holmes Mining Company and the Candelaria Water Works and Milling Company, Ltd., were separate corporations, their stock was owned by the same people. Though Bonbright and Company (a partnership, comprising

learned district judge's opinion (Italics supplied) : "In connection with this mill and its operation it should be noted that as originally there was in Candelaria no reliable or sufficient source of water, it was necessary in order to provide water for the operation of the mill and for the camp to bring water some 27 miles by means of a pipe-line from the White Mountains where certain water rights had been acquired previously.  The testimony and other proof indicate that the title to the water

some ten partners, residing, respectively, in London, New York, and Colorado) did not quitclaim to Esmeralda Water and Milling Company till 1907, proofs of labor were filed every year from 1901 to 1910, and later.  In 1902 one A. G. Draper, when filing proof of labor for the Lake and Dorris, did so as agent of the Calendaria Water Works and Milling Company, Ltd., whose ownership of the mill, as we have seen, long antedated any title attaching by reason of the acquisition of the Corkill locations.  Again in 1903, in filing proof on the Lake claim, he did so as agent for the same Calendaria Water Works and Milling Company.  F. G. Grube, in filing proof of assessment work for 1904, likewise did so as agent for the same company.  For the assessment work for 1905 Grube acted as the agent for both the Calendaria Water Works and Milling Company and Bonbright and Co., and the same the following year.  His proof in December 1907 for the work that year was as agent only for Bonbright and Co., but his proof in 1908 was as agent for Esmeralda Water and Milling Co., likewise repeated in January 1910 for the assessment work of 1909.  During the 1920's, proofs seem to have been filed indiscriminately for Esmeralda Water and Milling Company and for Candelaria Mines Company.  In 1912, when about 2,000 tons of ore were run through the mill in a six months' period, the tailings from which were discharged into the same tailings pond, Grube was in charge as "general manager of the Argenta Mining Company and the Esmeralda Water Company."  In this capacity he actually lived in Calendaria from 1903 to 1922, and made monthly trips from his new residence in California to Calendaria from 1923 to 1942.  The two corporations were under one management, and the mill and tailings pond of Esmeralda Water and Milling Company was the same that had been operated before his time by the old Calendaria Mining Company.  We see in the derivation of plaintiff's title from the Corkill placer locations nothing inconsistent with the claim to, and possession of, the water works, water rights and tailings pond (which covered a period prior to and at the time of and continuing beyond the Corkill locations) independently thereof or in addition thereto, and deriving, whether directly or indirectly, from Calendaria Water Works and Milling Co. in 1886.  The official Mineral county tax list for 1947 assessed to the appellant herein, improvements, pipe lines, etc., still identifiable with the original properties owned by Calendaria Water Works and Milling Company.

works which as above stated included a pipe-line, a reservoir, and water rights, *was in the operators of the mill.* As the mining activities at Candelaria began to drop off, the water works remained a valuable property and it was necessary to employ men to keep it in a condition of repair. The plaintiff finally succeeded to the ownership of the water works in 1929 from the Esmeralda Water and Milling Company and kept the water works operating until 1942 when its agent Mr. A. R. Nelson ceased living in Candelaria. In 1944, 12 miles of the pipe-line was sold to the State of Nevada together with water rights, with the right reserved in the vendor to re-purchase the same on specified terms at any time within 10 years from the sale."

As noted by the district judge, the Esmeralda Water and Milling Company owned the water rights. It also owned the mill, under the deed from Bonbright and others in 1907. But the deed from the trustees of Esmeralda Water and Milling Company to the Esmeralda Water Company, the plaintiff herein, also included the water rights *and the mill "and also the pile or bed of tailings located on the Lake and Dorris placer mining claims."* When Esmeralda Water and Milling Company leased the property to Jarmouth in 1918, including the mill, mill site, buildings, etc., it expressly reserved the tailings. Other instruments in the record likewise treated the tailings as personal property segregated from the real estate. It is also significant that plaintiff still is the owner of an option, running into the year 1954, to buy back from the state the water rights and twelve miles of pipe line sold to it in 1944.

■ Respondents at some length attack the deraignment of plaintiff's title, not only with reference to ownership of the ground in question but also with reference to ownership of the tailings, even if the same are considered personal property. We think it clear from the opinion of the trial judge that appellant's claim to the tailings traces back to the original mill, but even a break

in that chain of title would not destroy appellant's possesory right under color of title for some twenty years. Such possession, unless abandoned, affords it sufficient warrant to maintain this action. Risch v. Wiseman, 36 Or. 484, 59 P. 1111, 78 Am. St.Rep. 783; Schuman v. Venard, 110 Colo. 487, 136 P.2d 289; Stanley v. Sierra Nevada Silver Mining Co., C.C., 118 F. 931.

Respondents contend that "the lower court did not accept plaintiff's proof which sought to establish that it and its predecessors impounded the tailings upon the ground or preserved them against being lost  *   *   * the proof on the part of defendant and plaintiff in this respect was conflicting and the court chose to adopt the proof submitted by defendants as carrying the greater weight in this respect." A careful examination of the record, however, shows that this is not the case. The trial court made findings only as to the forfeiture of the plaintiff's Dorris and Lake claims and the lawful relocation of these claims by the defendants as the Victory and the Victory Fraction. It made no findings or conclusions whatsoever as to the preservation by the plaintiff and its predecessors of the tailings as personal property. In its opinion, however, the court definitely stated that the tailings came from the mill, that the retaining wall had been constructed for the purpose of containing the tailings, that overflow and driftings over the retaining wall were checked by the lower retaining wall and that the tailings, except for some that were lost by wind, erosion and storm waters, are still concentrated in the tailings pond. It was largely in view of this situation that we were moved to state that the court's general finding No. 7, "that plaintiff failed to substantiate by proof the allegations of its complaint and defendants have shown by proof the relocation of valid and subsisting mining claims  *   *   *" was of meager help. In view of findings one to six, having to do entirely with the location, forfeiture and relocation of the claims, this finding must be considered as attaching only to that

feature of the case. The court did not find that the plaintiff had not maintained its possession of the tailings pond. It did not find that the plaintiff had abandoned its possession or ownership of the tailings pond. It *refused* to find an abandonment of the tailings as personal property, and confined itself entirely to the question of forfeiture of the Dorris and Lake claims, and respondents, in seeking to uphold the judgment in their favor, under the trial court's theory, still insist that the question of abandonment is not in the case. There being no abandonment of the tailings by plaintiff and its predecessors, plaintiff is still the owner and entitled to the possession thereof.

The final disposition of the case on appeal involves some difficulty, as it is not the province of this court to make original findings. On the other hand no purpose could be served by directing a new trial for the purpose of permitting the trial court to make findings which it has already clearly indicated. It is clear that the judgment must be reversed on account of the trial court's erroneous decision that plaintiff's title to the tailings fails because the tailings were owned by the producers of the ores from the mines and not by the mill. It is our understanding from the record, however, that the trial court did not find, in fact refused to find, that plaintiff and its predecessors even abandoned the tailings or abandoned their claim of ownership of the tailings, other than through the court's erroneous conclusion that the tailings lost their character of personal property and became real estate, by reason of the so-called recognition by plaintiff of the Corkill locations. With our conclusion that the tailings were personal property belonging to Candelaria Water Works and Milling Company, and that plaintiff's title, or at least its possessory rights, attached thereto prior to the Corkill locations, and that such possessory rights were not destroyed by the Corkill locations in 1896, and in the absence of a

finding by the trial court, as a result of clear and convincing proof, that the tailings and plaintiff's possessory rights thereto had been abandoned, the case ends.

The trial court's findings to the effect that the Dorris placer mining claim and the Lake placer mining claim became forfeited by reason of failure of the owners to perform the annual assessment work thereon or to file notice of intention to hold said placer mining claims under the provisions of the acts of congress, for the years 1926–1945, and that said claims thereby became subject to relocation, and that the defendants Martin P. Mackley and Charles R. Hammock validly located the Victory placer mining claim and the Victory Fraction placer mining claim and that the same were at the time of the filing of the complaint herein valid and subsisting relocations of portions of the forfeited Dorris and Lake placer mining claims, are hereby approved. The judgment insofar as it adjudges that said defendants are the owners of the said Victory and Victory Fraction mining claims and that the same are valid and subsisting placer mining claims, is hereby affirmed. The judgment insofar as it fails to adjudge that the defendants' ownership of the Victory and Victory Fraction placer mining claims is subject to plaintiff's ownership and right to the possession of the tailings pond described in the complaint, is reversed. The case is remanded to the district court with instructions to modify and add to its findings and to enter judgment accordingly. Appellant will be allowed its costs in this court.

HORSEY, C. J., and EATHER, J., concur.

### ON PETITION FOR REHEARING

September 26, 1949.

*Per Curiam:*

Rehearing denied.